Per Curiam :
This case was referred to Chief Trial Commissioner Marion T. Bennett with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on October 26, 1967. Exceptions to the commissioner’s findings and recommended conclusion of law were filed by plaintiff and the case has been submitted by the court on oral argument of counsel and the briefs and supplemental memoranda of the parties. Since the court is in agreement with the opinion, findings and recommendation of the commissioner, it hereby adopts the same as the basis for its judgment in this case as hereinafter set forth. Therefore, plaintiff is not entitled to recover and the petition is dismissed.
OPINION OE COMMISSIONER
Bennett, Chief Commissioner: This is a civilian pay claim in which plaintiff contests his dismissal from a position with the Department of the Army and claims his wages which were lost as a result of the alleged illegal dismissal. Plaintiff has exhausted his administrative remedies up through the Civil Service Commission’s Board of Appeals and Review, which rendered a decision adverse to him. Some of the charges made against plaintiff were washed out in the process of administrative appeal and review. Before the court, plaintiff challenges the remaining charges, saying there is no substance or truth to them and that the adverse administrative decision is illegal because it is arbitrary and capricious. In *758 addition, plaintiff claims his dismissal arose from the personal dislike of him by certain superiors who acted out of bias, prejudice, malice, and bad faith. A de novo trial was held on the latter charge and also evidence was taken to show whether the other charges were supportable. The voluminous administrative record, consisting of numerous exhibits and transcripts of administrative hearings, is before the court and has been examined in detail. Findings have been made on each charge advanced against plaintiff. This case turns on its facts. Upon the basis of the facts as found and upon the ultimate findings and recommended conclusion appearing hereafter, it is determined that plaintiff is not entitled to recover and the petition must be dismissed.
FINDINGS op Fact
1. Plaintiff, a nonveteran, filed his petition herein on November 3, 1964, seeking back wages allegedly due by reason of wrongful dismissal on June 14, 1963, from his civilian position with the Department of the Army, Cameron Station, Alexandria, Virginia.
2. Plaintiff commenced his civil service career on July 9, 1940, as a temporary CAF-2 employee. After various assignments and promotions he was assigned to Cameron Station on August 20, 1956, as a GS-7, supervisory general supply assistant. On January 12, 1958, he was promoted to GS-8, supervisory supply officer, and on January 25, 1959, he was promoted to GS-9, supervisory supply officer. On or about August 15, 1960, the Signal Supply Division at Cameron Station was consolidated with Post Supply Division, and plaintiff, who had been in charge of Post Supply was placed in charge of the consolidated activities. On October 1,1961, plaintiff was promoted to GS-10, supply management officer. The evidence supports a finding that plaintiff satisfactorily performed his assignments up to this point in his career.
3. By memorandum dated October 31,1961, Major Stewart M. Harlan, who was plaintiff’s immediate supervisor, known as the S-4, informed plaintiff that his procedures for the management of funds for procurement of supplies and equipment for issue to customers were not providing the S-4’s *759 office with information necessary for planning and programming. Plaintiff was directed to establish appropriate procedures by November 17, 1961. This was not done. Based on such failure, and two other specific charges which followed, Major Harlan issued a letter of proposed reprimand to plaintiff on February 9, 1962, for failure to perform his duties as supply management officer satisfactorily. The letter enumerated the specific charges, and stated in pertinent part:
Based on the above incidents as well as other similar incidents, I am losing confidence in your ability to perform as Division Chief. In an attempt to correct this situation, I am directing CWO Robert J. Reynolds to apply his efforts in the next few months to the Post Supply Division. During this period, he will be Acting Chief, Post Supply Division. You will remain as Accountable Officer and I will expect full cooperation in assisting CWO Reynolds to bring the Post Supply Division up to standards expected by the Commanding Officer of Cameron Station [Colonel Parker] and by higher headquarters. Any future failure to satisfactorily perform your duties will result in more drastic disciplinary action.
íji # & #
I am available at any time to explain any policies of procedures that you are not familiar with or do not understand in an effort to help you avoid a recurrence of such an incident.
The aforesaid letter of proposed reprimand stated that plaintiff might reply personally and in writing within 5 calendar days, submit any affidavits and list any witnesses desired to support a contention that the action should not be taken; that careful consideration would be given to his reply; and that he would be furnished with a written notice as to whether the letter of proposed reprimand would remain part of his official file.
4. On February 16,1962, plaintiff made a written reply of some length to the proposed reprimand, discussing in detail each of the three specific charges. Plaintiff’s reply concluded as follows:
In view of all the above information, it is my opinion that the letter of proposed reprimand is not justified, or warranted; the charges are both incorrect and extremely *760 minor in nature; and that if any action should have been taken, it should have been a discussion with my supervisor, Major Harlan. I request that this letter not be placed in my 201 file.
5. On March 28, 1962, plaintiff was advised in writing by the civilian personnel officer, Cameron Station, that—
After careful consideration of the charges and your reply thereto, it has been decided that the charges are supported by substantial evidence, are sustained and warrant the official reprimand. Accordingly, a copy of this letter, the letter dated 9 February 1962 and your reply will be filed in your official 201 file.
You have the right to request a review of this decision under the Department of the Army Grievance Procedures as provided in Civilian Personnel Regulation E-2, within ten (10) working days after receipt of this decision. Such request should be made in writing, through channels, to the Commanding Officer, Cameron Station, Alexandria, Virginia.
Plaintiff did not request a review of the aforesaid official reprimand. He stated at the trial that the reason he did not appeal was that the commanding officer, Colonel Daniel Parker, told him that if he appealed he would just make it tougher on him (plaintiff). Plaintiff had not previously made this allegation.
6. Plaintiff testified that in the fall of 1961 he refused to fulfill a request for special personal equipment for the commanding officer because it was not permitted under the regulations. Plaintiff felt this resulted in an unfriendly attitude toward him by Major Harlan and the commanding officer. Mrs. Hill, a supervisor under plaintiff Menick, testified that during the period when Colonel Parker was the commanding officer, there had been a clash between the military personnel and Menick with respect to whether the regulations allowed allocation of certain property to military personnel.
7. Beginning at the time of the consolidation of plaintiff’s old supply unit with Signal Supply in August 1960, many newly acquired employees were disgruntled and morale was low. Whether this was caused by Menick’s incompetent supervision, as later testified to by several of these employees, or whether certain of these employees entered the new Post *761 Supply Division with a predisposed animosity toward plaintiff, due to their disappointment in the choice of plaintiff as their chief rather than their previous supervisor, or whether his strict requirement that work be performed in accordance with regulations, as plaintiff contends, is not specifically in issue here. In this regard, however, plaintiff had been considering officially reprimanding one or more of these disgruntled employees, when on April 26, 1962, two of his subordinates signed affidavits alleging that plaintiff had instructed them to falsify figures on an important report, known as ATLOG-25, to come within tolerances set by the Army. The following day, by letters dated April 27, 1962, plaintiff submitted letters of proposed reprimand to both of these subordinates and also to another employee. He signed each letter as the chief of the Post Supply Division.
On this same date, Colonel James H. Murphy was appointed by the Post Commander to conduct a thorough investigation of the allegations of falsification of records and mismanagement practices of the Post Supply Division, including any negligence, improper methods, action or lack of action in the division, to determine responsibility, and to recommend corrective action if such is indicated.
8. During the period beginning about February 9, 1962, CWO Reynolds had been assigned additional duties as acting Post Supply officer and had been instructed by Major Harlan to observe Post Supply and see what could be done to improve existing conditions and assist Menick in bringing about a smoother operation in Post Supply. On May 16, 1962, Reynolds submitted a 5-page report as to his “observations,” recommending the proper “remedial action” which he thought was in order. The report contained many suggestions for the improvement of the Post Supply Division, among which was the recommendation that a military man assume the duties of supply management officer as an assistant S-4 and that plaintiff be retained as accountable officer with a commensurate reduction in grade. After submitting the report, Reynolds returned full time to his duties as Signal field maintenance officer.
9. Colonel Murphy held a board hearing concerning falsification and mismanagement charges, took evidence during *762 May 1962, and submitted his report, dated May 24, 1962, to the commanding officer. The report revealed that, while the figures on the ATLOG-25 report were erroneous and “markedly favorable to Headquarters, Cameron Station, when compared to the corrected entries,” the motives of the employees making the falsification allegations were suspect because the charges were not brought forward until it was learned plaintiff intended to issue reprimands to them. Colonel Murphy found there was no intent to falsify such records and plaintiff was cleared of this charge. Colonel Murphy’s report sustained a finding that there were “failures in operations,” “poor supervisory practices,” including “negligence in supervising ATLOG-25 reports,” and “low morale” in the Post Supply Division. He recommended that plaintiff be promptly relieved of all duties as chief of the Post Supply Division for lack of demonstrated executive and administrative ability and that a commissioned officer be assigned as chief of Post Supply. Pie also recommended that a new position be established to embrace accountability, utilizing the report of CWO Reynolds concerning detailed organization and operation of the division. It was also recommended that the letters of reprimand issued by plaintiff be set aside.
10. On June 1, 1962, Major Albert S. Bartholomew replaced Major Harlan as S-4 at Cameron Station, and in June 1962 Colonel Charles W. Johnson succeeded Colonel Parker as commanding officer.
11. Colonel Johnson took no immediate action on the recommendation of Colonel Murphy that plaintiff be promptly removed, and on June 25, 1962, he issued instructions that CWO Reynolds be reassigned as acting Post Supply officer on a full-time basis for approximately 3 months, noting that “Reynolds apparently had not had full authority to act” in his previous assignment to Post Supply by Major Harlan. These instructions stated that Reynolds would be fully responsible as acting Post Supply officer and Menick would function as accountable officer. Colonel Johnson orally advised Menick on that date that he was deferring any decision in order to be fair to Menick, as well as in the interest of efficiency in operations. Plaintiff was advised at the time *763 that he would be observed during a 3-month period before any conclusions were reached as to his removal.
12. Following the 3-month period, it was learned that the proposed action had not followed proper civilian personnel procedures. Accordingly, on November 2, 1962, CWO Eeynolds was removed from the Post Supply Division, reassigned as assistant S-4, and plaintiff was again given full charge with a letter of warning from Major Bartholomew which was stated to be “based on discrepancies, inefficient management and operating practices revealed by a Board of Officers [Colonel Murphy] Investigation * * * and observed by your superiors to date,” and contained alleged deficiencies numbered a through j. Paragraph 4 stated:
4. You will be given a period of 90 days to attain satisfactory standards of performance. This period will begin effective 2 November 1962 and terminate on 1 February 1963. During this period you will be afforded every reasonable opportunity to improve your performance. This will be through counseling from CWO Reynolds. Additionally, I am available to be of any assistance that I can during this period.
13. Plaintiff was counseled on December 10, 1962, January 23, and February 4, 1963, by Major Bartholomew and advised of his specific failures of proper performance. He was given unsatisfactory ratings during this counseling period. On March 5, 1963, plaintiff was advised in writing that his employee performance and career appraisal would be unsatisfactory. On April 24, 1963, plaintiff was relieved as Post Supply management officer and Mr. Wayne Richardson was appointed to this post. Plaintiff remained as an assistant to Mr. Richardson, notifying the divisions of the change in management, and in order to protect and control his account, made plans for conducting his final inventory scheduled for May 6,1963.
14. On May 13, 1963, plaintiff was served with a written advance notice of proposed adverse action of “Removal-Inefficiency.” Paragraph 2 of said advance notice signed by Lieutenant Colonel Bartholomew, S-4, reads in its entirety as follows:
2. In a letter of warning issued because of your inefficient management and operating practices within the *764 Post Supply Division, dated 2 November 1962, you were given 90 days in which to attain satisfactory performance of duty or be removed for inefficiency. During those 90 days I furnished you counsel and guidance in an effort to help you attain the desired standard of performance. However, at formal counseling sessions on 10 December 1962, 7 January 1963, and 4 February 1963, I was compelled to inform you that your performance was still unsatisfactory. During this entire period, you continually placed the blame for your shortcomings and inefficiency on manpower shortages within your division. A management study of the Post Supply Division, conducted shortly before your letter of warning was issued, showed that you were not understaffed. It also indicated that your personnel were not being utilized efficiently, and that there was no cross-training being conducted. It is realized that from time to time vacancies have occurred as a result of employee turnover in the Post Supply Division. However, every organizational element of this installation has had the same problem at one time or another. It is expected that proper management of any office would preclude the operations of that office from disintegrating each time a position becomes vacant. Good utilization of assigned personnel, together with planned cross training, is a necessity in any organization.
Under paragraph 3 of said advance notice, specific charges were set forth, with examples under subparagraphs a,d,c, and d. Paragraph 4 noted that example (3) under charge 5, and examples (1), (2), and (3) under charge d, had occurred after issuance of the letter of warning on November 2, 1962. Paragraph 5 of said advance notice advised plaintiff of his right to reply to the notice personally and in writing within 10 working days of receipt of the notice, that his reply would be considered before final decision was made, and that he would be furnished a written notice of such decision.
15. Plaintiff filed his written reply to the proposed adverse action of removal for inefficiency on May 17, 1963. In reply to paragraph 2, plaintiff stated as follows:
2. The blame for my shortcomings and inefficiency was on manpower shortages within my division. I was understaffed. The personnel were being utilized efficiently, and there was cross-training being conducted. Vacancies went unfilled too long. The supervisor’s stock control branch position was vacant for 9 months. The *765 stock control clerk (key punch) position was abolished by you and was vacant for 5 months after which time you gave us the space back when we convinced you that the space was needed. This personnel shortage did not help me. Changes in the supply system had been placed in effect, which proved my efficiency. On 1 July 1962 a new supply system called “MILSTBJP” (AB 725-50) was placed into effect by Department of Defense. I was on vacation on 1 July 1962, but my clerks were so well trained by me that they phased into the new supply system MILSTBIP without any difficulty. Captain Jack Howard, Military District of Washington, G4 Headquarters commended me that he didn’t have to worry about me since I had trained the clerks. Further, I gave a demonstration of the new system to Fort Myer’s personnel engaged in supply work. This proved that my personnel were being utilized efficiently, that there was cross-training being conducted, and that I have the capability of supervising and training my clerks.
16. Plaintiff was notified under date of June 11, 1963, of the agency decision that charges a through d were sustained and warranted his removal, except example (2) of charge b was found not supported by the evidence and withdrawn, and example (3) of charge a was amended with respect to the date of April 8,1963, so as to read: “These recommendations were finally received on 2,1 February 1963, almost seven weeks after they had been requested.”
17. Pursuant to the notice of decision dated June 11, 1963, plaintiff was removed for inefficiency effective June 14,1963. The notice of decision advised plaintiff of his night of appeal to the Commanding General, MDW, and subsequently to the Civil Service Commission or to the Secretary of the Army, but not both, with the proviso that if the decision of the Commanding General on appeal to him was not made within 60 calendar days from the date of filing such appeal through the commanding officer, Cameron Station, plaintiff could elect to terminate the appeal to the Department of the Army by appealing to the Civil Service Commission.
18. On June 17, 1963, plaintiff requested an appeal to the Commanding General, MDW, under the grievance procedures provided in civilian personnel regulation E-2, and requested a hearing. In said appeal, plaintiff submitted a list *766 of individuals whom be desired to call to testify on his behalf, and requested that the adverse decision be canceled.
19. The administrative record reflects that a grievance hearing was held on September 4-5, 1963, and subsequently rescheduled for September 11, 1963, when it was learned that the recording machine at the initial session had not been operating properly. Plaintiff appeared at said hearings with counsel and testified, as did seven others called on behalf of plaintiff. The grievance examiner, Mr. Fagg, concluded that “management’s handling of the adverse action was administratively correct.” However, because in his view Mr. Menick’s lack of flexibility to meet the changing demands of his assignment did not merit deprival of the opportunity to earn a livelihood and obtain future employment, Mr. Fagg recommended that the Commanding General [Major General Wehle] of the Military District of Washington mitigate the adverse action and employ plaintiff at a minimum grade of GS-9 in one of the subordinate commands other than the Cameron Station.
20. On December 11,1963, Major General Philip C. Wehle advised plaintiff, through the commanding officer, Cameron Station, in pertinent part as follows, and enclosed the report of inquiry prepared by Examiner Fagg:
1. Eeference is made to your appeal submitted in response to your removal for inefficiency on 14 June 1963.
2. All facts pertinent to your case have been analyzed and it is concluded that the removal action is sustained. This decision is made on the basis of evidence presented which substantiates the charges of inefficiency and warrants the removal action. Considering these facts, I am unable to mitigate the adverse action as recommended by Mr. Fagg, the appointed Grievance Examiner.
In this letter of December 11, 1963, plaintiff was further advised of his right to request review of the decision by the Secretary of the Army, or to appeal to the Appeals Examining Office, United States Civil Service Commission (CSC), but not both.
21. Plaintiff filed a timely appeal from the above decision to the Appeals Examining Office, CSC, on December 17, 1963. Plaintiff predicated his appeal upon the grounds that there was no evidence in the record to sustain the charges *767 against him and that there had been no compliance with 5 U.S.C. § 652 in discharging him. Plaintiff demanded that he be permitted to appear with counsel at a hearing at which witnesses could appear and proof be presented, both oral and documentary.
22. Prior to any action by the Civil Service Commission on plaintiff’s appeal, the Department of the Army was in receipt of a letter dated December 17, 1963, from the House Military Operations Subcommittee of the Committee on Government Operations (Holifield Committee) which made reference to Examiner Fagg’s report recommending that plaintiff be retained at a minimum grade 9 or that he be assisted in finding other satisfactory employment. The letter commented on plaintiff’s 22 years of employment with the Army, and suggested that the Army might wish to reconsider the matter since the equities seemed to be so compelling and Examiner Fagg’s ruling seemed to be a reasonable course of action.
On January 2,1964, as a result of the inquiry by the Holi-field Committee, plaintiff was offered a GS-7 position at Ft. Myer as a self-service supply center manager. This position was offered based on inefficiency at the GS-10 level, which indication would remain in plaintiff’s file. Plaintiff was advised he would continue to have the appeal right to the Civil Service Commission on this reduction in grade. Plaintiff refused to accept a GS-7 position, which was designated as a reduction due to inefficiency.
On January 6,1964, the MDW of the United States Army advised the Holifield Committee that “recommendations have been made to place Mr. Menick in a position at the GS-9 level; however, the Military District of Washington does not have such a position which is vacant. A position of Self Service Supply Center Manager, GS-2001-7 is currently vacant and was offered to Mr. Menick on 2 January 1964. Mr. Menick refused to accept this position, * *
23. A Civil Service Commission hearing was held on plaintiff’s appeal, on February 20,1964, with additional submissions made on March 6 and April 30, 1964. Mr. S. L. Elliott, chief of the Appeals Examining Office, filed a 21-page report on May 28,1964, in which he found, in substance, that *768 the evidence sustained all the charges and specifications, except 3a(2), part of 3a (3), and 3b (2), and recommended no change in the personnel action of the Department of the Army in effecting plaintiff’s removal on June 14,1963. Plaintiff’s contention that the Army had not complied with the proper procedural requirements was dismissed. Examiner Elliott found that little weight, if any, could be given to plaintiff’s contention that CWO Reynolds was entirely responsible for Post Supply operations between February 9, 1962, and November 2,1962. He found that Menick’s responsibility as accountability officer was untouched at all times and that officials at Cameron Station did not bypass plaintiff after the advent of CWO Reynolds. He found, additionally, that little weight could be given to plaintiff’s defense that he had a personnel shortage during this period.
24. On June 2, 1964, plaintiff timely appealed the decision of the Appeals Examining Office, predicated upon the contentions that incompetent and irrelevant evidence was considered ; that 5 U.S.C. § 652 required a finding that discharge would promote the efficiency of the service; that the evidence on behalf of plaintiff was not properly evaluated; that the decision was arbitrary and capricious; and that the decision was biased.
25. In a decision rendered on September 21, 1964, the Board of Appeals and Review, Civil Service Commission, affirmed the decision of the Appeals Examining Office on all counts except as to charge 3b (1), which it found lacked specificity and detail. It also sustained paragraph 4 of the letter of charges. The board found plaintiff’s removal was not arbitrary, capricious nor unreasonable but was for such cause as would promote the efficiency of the service within the meaning of the Commission’s regulations in part 752-B.
26. Plaintiff filed his petition in this court on November 8, 1964, alleging, among other tilings, that the Civil Service Commission Board of Appeals and Review findings were arbitrary and capricious, that Major Bartholomew and Colonel Johnson filed charges against him because of their personal dislike of him and not on the basis of his work performance, and that he, Menick, was charged with matters which were the responsibility of CWO Reynolds who was act *769 ing Post Supply management officer from February 2, 1962, through November 2, 1962. Plaintiff demanded and was granted a de novo trial herein for proof of the above allegations as well as to show that plaintiff had demanded and the agency persistently refused to produce certain documents so that plaintiff could be fully advised of the specific nature of the charges against him and adequately and reasonably defend himself.

Charges Filed Against Plaintiff Menich June 1962 Inventory

27. The specific charges filed on May 13, 1963, were answered by plaintiff on May 17, 1963. Those pertinent herein are listed and discussed hereafter:
3a (1). You neglected to accomplish an inventory in June 1962 as directed by letter ANWCM-f, hq mdw, subject: “Reconciliation — Category Ledger Amounts with Evaluated Stock Record Quantities”, 25 January 1962. You did not attempt a reconciliation, and subsequently submitted two inventory adjustment reports in direct violation of para 82b (2), AR 711-16. This action resulted in an erroneous report being submitted at the close of FY 62. The completion of an inventory during the latter part of August 1962, as directed by me, proved your original report to be completely erroneous and misleading, and was subsequently a matter of inquiry by the uscoNARC Inspector General.
Plaintiff answered this charge as follows:
3a (1). I did not neglect to accomplish an inventory in June 1962 as directed by letter aNwcm-f, hq mdw subject: “Reconciliation-Category Ledger Amounts with Evaluated Stock Record Quantities”, 25 January 1962. I did not receive a copy of subject letter dated 25 January 1962.1 only received a copy of the 1st Ind written by the Finance & Accounting Officer, Cameron Station, dated 30 January 1962. A reconciliation was made in accordance with paragraph 7-33, AR 37-108, and two inventory adjustment reports were submitted in accordance with paragraph 82b (1), AR 711-16 and there was no direct violation of paragraph 82b (2), AR 71-16. This action did not result in an erroneous report being submitted at the close of FY 62. The completion of an inventory during the latter part of August 1962, as directed by you, did not prove that my original report to be completely *770 erroneous and misleading. All statistics were taken from the Stock Accounting Record (DA Form 1296). On 80 June 1962 the closing dollar value of funded inventory of $85,635.61 was adjusted by $54,608.50 to agree with the actual recorded dollar value inventory of $140,244.11. The unfunded closing inventory of $197,067.49 was adjusted to agree with actual recorded dollar value inventory of $151,746.99. On the 29th, 30th and 31st of August 1962 a physical and dollar value inventory was taken and as a result of this inventory a funded inventory adjustment of $4,020.57 was made to category ledger to agree with stock record account. An unfunded adjustment of $46,753.05 was made which resulted in a $50,773.63 over all adjustment. These inventory discrepancies were caused by price changes, and items changed from funded to unfunded or unfunded to funded by the Depots. In order to preclude for the large discrepancies dollar value of the account an inventory adjustment is submitted as required upon receipt of price changes and changes from funded to unfunded or unfunded to funded from the Depots.
28. This was not the first occasion plaintiff was aware of this alleged deficiency. On or about January 31,1962, plaintiff received a copy of the first endorsement dated January 30, 1962, from the Finance and Accounting Office which referred to “reconciliation-category ledger amounts with evaluated stock record quantities,” and stated that a complete valuation of stock record accounts and reconciliation with financial records had not been accomplished and were to be scheduled for May 31, 1962. This was attached to an informal handwritten memo routing slip from the Finance and Accounting Office directed to Mr. Menick’s attention, advising him that this would require a complete physical inventory. Plaintiff received permission from the S-4 to delay inventory-taking until June 1962, according to his handwritten changes on the directive initialed by him. This physical inventory was not taken in June as directed.
29. Shortly after CWO Reynolds was reassigned by Colonel Johnson to Post Supply on June 26,1962, he had an inventory taken from the stock card records (not a physical inventory), which according to Reynolds is performed each month for a reconciliation with Finance and Accounting with discrepancies usually being negligible. Plaintiff had gone on *771 annual leave shortly after June 26, 1962, and did not return until July 18, 1962, at which time he used adding machine tapes from this inventory for the reconciliation rather than a physical inventory. This was used as the closing inventory for the fiscal year 1962.
30. On the inventory adjustment report for the funded inventory dated July 20, 1962, plaintiff signed as approving authority as well as accountable officer, contrary to paragraph 82b (2), AB, 711-16, which states, “under no circumstances will an officer who is himself an accomitable officer be authorized to approve adjustment reports, except when the form is used in reconciling financial records under FIA [Financial Inventory Accounting] with item records.”
31. The first endorsement referred to by plaintiff, in his answer to charge 3a (1), clearly points out in the first two paragraphs that Financial Inventory Accounting was not accomplished at Cameron Station, but that the system utilized was Command Management Inventory Accounting. Additionally, plaintiff failed to include a statement with these adjustment reports indicating an effort to locate the differences for the approving authority’s perusal where the deficiences were significant, which was contrary to Army regulations. CWO Beynolds felt these differences were definitely significant and Major Thomas B. Whalen, Finance and Accounting officer, has testified that plaintiff’s adjustments were not normal and should have been supported by a complete narrative analysis as to why this happened.
32. Plaintiff’s written statement regarding these deficiencies dated August 3, 1962, when all tapes and other records pertaining to this inventory were available, stated in significant part, as follows:
At the end of each Fiscal Year the dollar value of the stockage'and fringe items were taken. A physical inventory was not taken at the end of each fiscal year. I was informed by Finance and Accounting Office at the end of each fiscal year to take the dollar value of the stock-age and fringe items and to submit an IAB. I was never instructed by Finance and Accounting Office to take a physical inventory and dollar value of the stockage and fringe items at the same time.
I have no explanation as to why I signed in the approval authorities block except for the fact that I fol *772 lowed the same procedure that I did at the end of fiscal year 1961.
Plaintiff testified in this court that he signed inventory adjustments as accountable officer only, and that the S-4 was the approving authority, or in his absence the executive officer or commanding officer.
33. When CWO Reynolds uncovered these deficiencies, he made an investigation and report to the S-4, dated August 3, 1962, recommending that Post Supply be closed on August 27-29,1962, for a complete physical inventory. This physical inventory was completed on the dates specified and a further overall adjustment of $50,773.63 was required.
34. It is found plaintiff failed to take a physical inventory by June 30,1962, as directed. He signed an inventory adjustment report as approving authority in violation of paragraph 82b (2), AR 711-16, and as a result of these deficiencies, the closing inventory for the fiscal year 1962 was erroneous and required a $50,773.63 overall correction after the physical inventory was taken in August 1962. The finding by the Civil Service Commission that this charge was sustained is affirmed herein as supported by the preponderant weight of credible evidence.

Failure to Conduct Cyclic Inventories

35. Charge 3a (2) and all but the first sentence of charge 3a (3) were excluded by the Civil Service Commission. Charge 3a (3), as it is pertinent herein, states: “On 10 December 1962, in answer to my questions, you informed me that you were not conducting cyclic inventories, even though you knew that you should be, and you admitted that you had not reported this to anyone.”
Plaintiff replied: “Cyclic inventories were not taken after the inventory of August 1962, due to shortage of personnel in the division and mainly that the supervisor’s position, stock control branch was vacant.”
Plaintiff testified at the trial herein that CWO Reynolds told him not to make cyclic inventories after August 1962; that such inventories were difficult to take because of a new system, mustkcp ; and furthermore that they were made im *773 possible because of the shifting of various warehouse items to Ft. Myer. The additional reasons as to Reynolds orders to stop the cyclic inventories and difficulties because of milstRip had not come to light prior to the trial in this court.
36. Army regulations require that a physical inventory be made annually or a cyclic inventory be kept. The memorandum of counseling dated December 10, 1962, revealed that plaintiff was questioned by the S-4 as to his inventory plans, that is, whether he would take a yearly physical inventory or was taking monthly cyclic inventories. Plaintiff replied, in substance, that he was instructed by Reynolds to take a monthly cyclic inventory following the August physical inventory but that it was not being accomplished due to workload and shortage in office personnel and because of shipments of supplies to Ft. Myer. He admitted he had not reported this failure to take cyclic inventories to anyone. When asked whether he was committed then to taking a yearly physical inventory in view of this, he replied the last instructions were to conduct a cyclic inventory.
37. On February 21, 1963, in reply to a written request by the S-4 as to the dates scheduled for his physical inventory, plaintiff recommended a cyclic inventory be approved in lieu of an annual physical inventory, and that a physical inventory at the end of that fiscal year be abolished if the cyclic inventory was approved and put into effect. A cyclic inventory was actually placed into effect in June 1963 after plaintiff’s removal, and after the physical inventory was made in May 1963 transferring plaintiff’s accountability to the new Post Supply management officer.
The weight of the credible evidence from contemporary records supports the Civil Service Commission’s finding sustaining this charge.

Controls over Loomed Property

38. Charge 3b dealt with the loaning of Government equipment to military personnel on change of station. Charge 3b (1) was dismissed by the Board of Appeals of the Civil Service Commission and charge 3b (2) was dismissed at the agency level.
*774 Charge3b(3) stated:
On 2 November 1962 I directed you to establish rigid controls over the loan of such property within 30 days. On 10 December 1962 you informed me that you had a draft copy of an SOP, furnished you by CWO Reynolds, which you were reviewing, and would submit to me. On 31 January 1963 I reminded you in writing that I had not yet received the SOP. You finally submitted the SOP on or about 15 February 1963, ten weeks after the due date.
Plaintiff replied that “due to shortage of personnel and the vacancy of the supervisor, stock control branch, it took me time to review the SOP and return it to your office. After all, I was without a supervisor, stock control branch for 9 months.”[1]
Plaintiff testified herein that the 30-day deadline was insufficient time to review and approve CWO Reynolds’ SOP on the loan of Government property and equipment because of the shortage of personnel and other deadlines which were required by the warning letter.
39. The Civil Service Commission sustained this charge, finding that the shortage of personnel, particularly of one cited position, could not excuse this failure and that the more than 90 days required to review, and correct if necessary, the SOP written by CWO Reynolds, for which plaintiff was allotted 30 days, was excessive. The finding of the Civil Service Commission is supported by the record.

Lack of Financial Management Oapaoity

40. Charge 3c alleges plaintiff was unable to comprehend the overall requirements of financial management and the relationship of procurement actions and programs to the funding program, which resulted in additional work for both the comptroller and the office of S-4.
*775 Charge 3c (1) stated as follows:
On a procurement schedule dated 8 January 1962, you showed programmed orders to be placed during the third quarter in the amount of $101,000 and for the fourth quarter in the amount of $50,000. In March 1962, as the obligation rate was below total station program, you were queried as to how much of your fourth quarter orders you could place by the end of March. You stated that you could utilize approximately $40,000, and you were given the funds to cover this. On your revised procurement schedule dated 4 April 1962, you showed actual orders placed during the third quarter of $233,-844, and revised requirements of $13,000 for the fourth quarter. Shortly after the beginning of the fourth quarter you stated that you would be unable to operate with only $13,000 as you had overlooked requirements amounting to approximately $39,000. You could give no explanation as to how this could have occurred after having been advanced funds earlier.
41. Plaintiff replied to this charge as follows: “This was due to more orders placed than was [were] programmed. However, due to funds being available and year end spending, more orders were placed than were programmed. Also this was due to lack of funds to obligate which makes it difficult to program. I did not overlook any requirements.”
42. At no time has plaintiff contested the figures set forth in this charge. The specific charge shows that for the fiscal year 1962, plaintiff programmed orders for $101,000 for the third quarter and $50,000 for the fourth quarter. As the obligated rate was below the station program in the third quarter, plaintiff was asked by the Comptroller how many of his fourth quarter orders he could place in March 1962. He stated that he could use $40,000 in funds which were given him, leaving $10,000 for the fourth quarter. On a revised procurement schedule dated April 4, 1962, plaintiff showed he had placed orders for $233,844 during the third quarter alone. This was $132,844 more than originally indicated in January, and $92,844 more than that which he said he could use through March 1962. This same schedule showed requirements of $13,000 for the fourth quarter, which amount was reasonably close to the remaining $10,000 programmed. *776 Shortly thereafter plaintiff advised that he had overlooked requirements amounting to $39,000.
These activities showed a clear lack of understanding or ability in the overall requirements of budget planning. Plaintiff’s explanation that more orders were placed than programmed does not rebut the charge. The only additional evidence at the trial herein was plaintiff’s statement that he had insufficient time to rebut the charge since he was given only 10 working days. This excuse is untenable since the charges were made by letter dated May 13,1963, and plaintiff’s reply letter was dated May 17, 1963, only 4 days thereafter.
The Civil Service Commission found this charge was sustained. Its finding is supported by the record in the case.
43. Charge 3c(2) stated as follows:
Hq MDW furnished guidance to the staff of Hq Cameron Station, including yourself, in the preparation of a report “Analysis-O&MA Financed Inventories FY 62 (DA Cir 11-3, ECS SCSAA-OT-121)”. You submitted the feeder report from Post Supply Division to Comptroller. In the analysis of the feeder report, it was found most difficult to relate the report data to the budget submitted for FY 63. In one item of Section IV (Material Eequirements-During Period line B3 Non-EO Items, Other) you had used figures of $123,000 FY 62 and $44,000 FY 63. DA Cir 11-3 required that this item be fully explained when any amount would be indicated as on hand in either FY 62 or FY 63. Major Whalen asked you to provide him with data to support both of these entries. You could not support the entries, and both amounts were therefore reduced to zero. Of the total of 225 entries on your feeder report, 25 had to be revised or eliminated. If these errors had not been detected by the Comptroller’s Office, this headquarters would have been embarrassed, and could possibly have suffered in not having sufficient funds to finance station owned inventories.
Plaintiff replied as follows:
Hq MDW did not furnish me guidance in the preparation of a report “Analysis-O&MA Financed Inventories FY 62 (DA Cir 11-3, ECS SCSAA-OT-121)”. DA Cir 11-3 prescribed this as a one-time report. To my knowledge this one-time report was never used to provide a detailed analysis of OMA financed inventories in sup *777 port of apportionments for FY 63 budget justification. Everyone at Cameron Station was in a state of confusion as to the preparation of this one-time report. A typed copy was never furnished me as to the final outcome of this report. I only have my pencil worked copy. The $123,160 for FY 62 consisted of $60,000 Clothing & Equipment & Supplies issued to Fort Myer as directed by MDW and $63,160 transfers to Property Disposal Officer and return to Depots. I could support the entries. The $44,000 for FY 63 was reduced to zero as no programming could be made for FY 63.1 do not recall the 25 entries on my feeder report being revised or eliminated since I did not get a typed copy from the Comptroller. This is the first time this report was brought to my attention for errors since it was submitted in 1962.
44. The above-described report, upon which the charge is based, was a one-time report formulated in February 1962. This was a consolidated report of the post engineer and Post Supply Division. Major Whalen, then Finance and Accounting officer, could not relate the figures plaintiff submitted on the feeder report for this consolidated report with the actual program and budget submitted approximately 60 days earlier. Major Whalen spent many hours working on plaintiff’s portion of the report, whereas the post engineer’s problems were resolved in less than 1 hour. Of a total of 225 entries on the feeder report, 25 were revised or eliminated. With respect to plaintiff’s use of the figures $123,000 and $44,000 in this report, Major Whalen testified that the line on which these figures were placed by plaintiff should have been left blank for Cameron Station as they had no troops drawing out supplies from the Property Disposal Division in support of their missions, such as at Ft. Bragg and Ft. Campbell. He pointed out that the circular specifically stated that the line would be left blank unless it was fully justified, which could not be done for Cameron Station. Major Whalen reported these difficulties to plaintiff’s supervisor, the S-4, but plaintiff was not informed of this complaint until the statement of charges was issued on May 13,1963, over a year thereafter. Such a delay appears wholly unwarranted.
45. The evidence establishes that plaintiff had substantial difficulties with Major Whalen in the preparation of the report; however, the evidence does not fully sustain the *778 charge since neither the consolidated report, nor plaintiff’s feeder report, nor DA circular 11-3 containing instructions relating to plaintiff’s insertion of figures $123,000 and $44,000 incorrectly, was placed in evidence. Proof to support this charge is dependent upon testimony of Major Whalen. He testified that plaintiff pulled his feeder report figures “out of thin air,” whereas plaintiff maintained at the previous hearings that he had support for these figures in that they were obtained from customer requirements. Further, while plaintiff has maintained at all times, and it has never been disproved, that the figures of $123,000 and $44,000 could be supported from his records at Post Supply, the charge apparently is directed to his placing these figures in the report on a line that should have been left blank, as far as Cameron Station was concerned. This charge is not so sufficiently clear in the statement of charges that after a lapse of over a year, plaintiff could intelligently answer such a charge without the report, or at least the instruction circular accompanying the report. Neither of these has ever been furnished plaintiff nor placed in evidence. It is found that this charge is not sustained by the evidence.

Plaintiffs Uncooperative Attitude

46. Charge 3d relates to plaintiff’s unsatisfactory attitude and performance in furnishing requested information. Charge 3d(l) stated as follows:
On 10 December 1962,1 informed you that the period of review of the budget and preparation of the FY 64 budget was approaching, and that your work in December and January in this regard would be observed and evaluated, since this was occurring during your 90 day warning period. On 4 January 1963 I was informed that my office was having difficulty getting information from you in connection with the inventory and procurement schedule for the mid-year review, even though this information was readiiy available to you. It became necessary for me to direct you to submit the necessary information by 5 January. You then furnished this information within a few hours. Had you adopted a positive attitude and furnished this information when previously requested by my office, much time would have been saved by all concerned.
*779 Plaintiff replied: “I have always adopted a positive attitude.”
This charge stems from a midyear review report wherein an employee in the S-4’s office, Mrs. Duke, could not get plaintiff to correct certain figures. She reported this to the S-4 who called plaintiff to his office and directed him to complete this report by 10 o’clock the following day. Plaintiff advised the S-4 he could not work overtime and his employees would not work overtime, even though overtime pay would be given. Mrs. Duke advised plaintiff he could complete the corrections in half an hour if he made a serious attempt. Plaintiff actually did complete these corrections in approximately one-half hour, and before the close of business on that day.
The Civil Service Commission finding that this charge was sustained is supported by the record.
47. Charge 3d (2) stated as follows:
On 10 December 1962 you gave me a narrative account of a shipment of newsprint delivered to your warehouse on 7 December, and which was returned, unloaded, to the vendor on the same date. I asked you to verify the facts relative to the shipment, and to give me an official report of the incident. I made it clear that I wanted a statement as to whether there was any delay in handling the shipment, and if so, where and by whom. Failing to receive your written report, I reminded you on 31 January 1963 that I had not yet received your report. You did not submit it until 26 February 1963, ten weeks after I had requested it.
Plaintiff replied: “Due to the shortage of personnel and the supervisor’s vacancy, I did the best under the circumstances.”
The Civil Service Commission found that, although no specific deadline was established for the submission of the official report, the delay of approximately 10 weeks in complying with the order tends to reflect an unreasonable attitude and unsatisfactory performance in furnishing the requested information. The determination by the Civil Service Commission is fully supported by the record herein.
48. Charge 3d(3) stated:
On 2 November 1962 you were given a period of 15 days in which to write an SOP on the flow of documents *780 to insure to a maximum degree the supplying, of requested items. You prepared certain charts showing the flow of DA Forms 1546, which were useful, but they did not constitute an SOP, and I so informed you on 31 January 1963. You have still not submitted the SOP.
Plaintiff did not furnish a written reply to this charge by his answers in the letter of May 17,1963. He testified at trial that it would have been impossible to write an SOP on this matter within the 15-day deadline allowed. Plaintiff was reminded by memorandum dated J anuary 31,1963, that while he had prepared certain flow charts which were useful, he had not yet complied with instructions to prepare an SOP, which would have been a narrative account of the proper flow of documents through Post Supply to insure the maximum degree of efficiency in supplying customers with items requested. Plaintiff’s failure even to begin this task from the date of the letter of warning on November 2, 1962, until May 13, 1963, the date of the letter of charges, reflected a dilatory and unreasonable attitude in furnishing requested information. The Civil Service Commission has sustained this charge, which is fully supported by the evidence.
49. Plaintiff has testified herein that with regard to charges 3d(l), (2), and (3), he either did not reply or did not reply in detail because of the inconsequential nature of the charges, because he felt they were included only because Major Bartholomew “was out to get him,” and since he only had 10 days to answer the charges, which he felt was insufficient time. It is found these charges are not so inconsequential that they could be properly ignored. The contention that 10 days was insufficient time to answer the charges is untenable as found also in finding 42, since plaintiff answered the other charges on May 17,1963, 4 days later.

Delinquent Receiving Reports

50. Paragraph 4 of the advance notice of removal, listing the charges against plaintiff, dated May 13,1963, insofar as it deals with a specific charge, stated in pertinent part: “* * * on 25 J anuary 1963, a DF from the F&AO to the Comptroller reported your failure to submit receiving reports to that office in a timely manner as prescribed by regulations, resulting in *781 a waste of manpower resources in the F&AO Office. Your failure to comply with written instructions from me relative to this matter resulted in my having to issue you a written reprimand on 5 March 1963.” This charge stated that plaintiff failed to comply with written instructions from the S-4 on the matter. Plaintiff flatly denied this charge in his reply of May 17,1963.
51. Receiving reports are documents showing that supplies were received by a specific division. They were sent to the Finance and Accounting Office by the division receiving the supplies, prior to payment of the bill by Finance, except that depot payments were automatic. Those reports were due from 2 to 6 days after receipt of the supplies. The Finance and Accounting officer, Captain William F. Thatcher, was having difficulties getting the receiving reports from the Post Supply Division in the latter part of 1962 and early 1963. After several contacts with Menick in an effort to correct the deficiency, Thatcher reported the deficiency to the Comptroller in early 1963, and was directed by the Comptroller to make a list of all delinquent receiving reports from all divisions. This list was prepared on or about January 23, 1963, and showed Post Supply Division had delinquent receiving reports running to 4 or 5 pages with at least 30 items to the page, whereas the other two divisions which submitted these reports, namely, the R and IT Engineering Supply Office and the Central Commissary Office had less than 1 page of delinquencies between both offices. This state of affairs added appreciably to the workload of the accounting section. Immediately after the letter of January 25,1963, was written the situation improved and many receiving reports were received from plaintiff, and improved service continued thereafter. Plaintiff has maintained that one of the primary reasons for such delinquencies was that commissary personnel, who had physical possession of the IBM machines necessary to make out these reports, did not allow Post Supply to use the machines until after the letter of January 25, 1963, was issued and the S-4 “laid down the law” to them. Plaintiff had not reported that the reason for the delays was the lack of availability of the IBM machines prior to the Civil Service Commission hearing. It was the testimony of the Finance *782 and Accounting officer at that hearing that Post Supply had the same opportunity to use the machines as the other divisions, including the Finance Office, and that the requirement was that each office would apply to the commissary office and have its work fitted in at the convenience of the commissary personnel.
The weight of the evidence indicates that, although the lack of IBM machines may have caused an occasional delay, it is not sufficient to explain continuous delinquencies encountered by the Finance and Accounting Office with plaintiff’s account over a period of several months. The decision of the Civil Service Commission Board of Appeals and Beview sustaining this charge is fully supported by the record.

Plaintiffs Miscellaneous Charges

52. Plaintiff maintained both at the trial and before the Civil Service Commission that he was being charged with matters which were properly within the scope of the duties of CWO Beynolds, who was acting chief of the Supply Division from February 9,1962, to November 2,1962.
The evidence indicates that from'February 9,1962, to May 16,1962, CWO Beynolds was acting Post Supply officer. The S-4 appointed Beynolds to act as an adviser to plaintiff, to aid and assist him, observe the functioning of Post Supply and make recommendations for improvement in the division. That assignment was to be performed in addition to his regular duties as Signal field maintenance officer. From June 26,1962, to November 2, 1962, CWO Beynolds was made acting Post Supply officer on a full-time basis with complete authority and responsibility under the S-4. At all times during this period, plaintiff remained the accountable officer. The evidence establishes that in this capacity plaintiff was responsible for the taking of inventories, reconciling the account, writing SOP’s insofar as they dealt with the account, maintaining accountability for the items in stock, and furnishing financial information for the budget and other reports where his account was concerned. The Civil Service Commission found that plaintiff was not relieved of his responsibility for the deficiencies set forth in the list of charges, despite *783 Beynolds’ temporary assignment to Post Supply. This finding was correct.
53. Plaintiff alleged for the first time, in his petition to this court, that Bartholomew and Johnson filed charges against him because of a personal dislike, rather than on the basis of his work performance. Plaintiff has presented no credible evidence to support that contention and has requested no finding of fact thereon. There can be no doubt that both of these individuals desired to have plaintiff relieved of his duties as Post Supply management officer in May 1963 because of difficulties they were having with plaintiff which were in part enumerated in the list of charges. No evidence was presented at the trial or at the previous board hearings to the effect that the charges were based on a personal dislike for plaintiff or arose from prejudice or discrimination. Plaintiff’s testimony exculpated Bartholomew of bad faith.
54. Plaintiff has alleged that he was refused certain documents which were necessary to defend himself adequately. This charge is unsupported by the voluminous record except as to charge 3c (2), which is explained in findings 43,44, and 45. Plaintiff either had access to the reports he refers to at the time he prepared his various answers to charges against him or he withdrew his request therefor during administrative proceedings, or the charges pertinent to said documents were thrown out or the documents are in evidence. Plaintiff admitted on the record at the close of the grievance hearing before Examiner Fagg, September 11,1963, that he had a fair hearing and that the witnesses had brought out all the facts.
Ultimate FINDINGS and CONCLUSIONS
55. It is found that the specification of charges sustained by the Board of Appeals and Keview, Civil Service Commission, and as set forth in the letter of charges as items 3a(l); 3a(3), first sentence; 3b(3) ; 3c(l); 3d(l), (2), and (3); and the charge set forth in paragraph 4 thereof, are supported by substantial evidence in the record of trial and by a clear preponderance of the credible evidence in the administrative record. It is further found that the evidence does not sustain charge 3c (2) for the reasons set forth in findings 43,44, and 45.
*784 56. It is further found that plaintiff has not sustained his burden of proof at trial to support his allegations that he was charged with dereliction of duties for which he was not responsible, that the charges against him were motivated by personal dislike and not on the basis of work performance, and that he was refused access to documents necessary to his defense.
57. The administrative determinations adverse to plaintiff are final, absent arbitrary or capricious action or substantial and prejudicial error in the discharge procedures. Although plaintiff’s discharge instead of demotion, as recommended by an examiner, might be harsh and the court would have treated the matter otherwise, it will not review the merits of the separation when adequate cause for separation has been shown and the established procedures for separation have not been shown to have been violated. Morelli v. United States, 177 Ct. Cl. 818 (1966); Angrisani v. United States, 172 Ct. Cl. 439 (1965). If an employee is charged with and discharged for inefficiency which is clearly proved, it is clear that such discharge is for the promotion of the efficiency of the service whether or not stated in such statutory terms, and that the requirements of the statute have been met. Act of August 24,1912, § 6, 37 Stat. 539, 555, as amended by the Act of June 10, 1948, 62 Stat. 354, 5 U.S.C. §652 (Lloyd-LaFollette Act); Begendorf v. United States, 169 Ct. Cl. 293, 340 F. 2d 362 (1965); DeBusk v. United States, 132 Ct. Cl. 790, 794 (1955), cert. denied, 350 U.S. 988 (1956).
58. Specific charges of inefficiency and incompetence which are fully sustained by the evidence cannot be successfully rebutted by any general inference or presumption of efficiency or competence arising from satisfactory job performance in other Government positions at lower classified grades. Further, it is well settled that it is not a prerequisite to the discharge of an inefficient employee that he first be given an unsatisfactory performance rating. Angrisani v. United States, supra at 444; Alpert v. United States, 161 Ct. Cl. 810 (1963). In the instant case, however, plaintiff’s inefficiency was reflected by his unsatisfactory rating prior to his discharge.
*785 Conclusión of Law
Upon the foregoing findings of fact and memorandum opinion which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

 The significance in having a standard operating procedure (SOP) for the loaning of Government property was based on the fact that this operation was improperly handled in the past, requiring about 80 letters to be directed to various individuals on property loaned for which they were still charged. These persons, for the most part, had already returned the equipment, and in some instances made payment, all of which resulted in no real shortage in the account. The charges in 3b (1), which were directed toward this matter, were dismissed.